UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

NICHOLAS L. PRILL,

              Plaintiff,            Case No.
                                      Hon.

vs.

CTERA NETWORKS, INC., a Delaware
Corporation, and CTERA NETWORKS, LTD.,
an Israeli corporation,

              Defendants.
_____/

Raymond J. Sterling (P34456)
James C. Baker (P62668)
Attorneys for Plaintiff
STERLING ATTORNEYS AT LAW, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
rsterling@sterlingattorneys.com
jbaker@sterlingattorneys.com
_____/

**COMPLAINT AND JURY DEMAND**

      Plaintiff Nicholas L. Prill, by his attorneys Sterling Attorneys at Law,

P.C., for his Complaint and Jury Demand against defendants CTERA

Networks, Inc. and CTERA Networks, Ltd. (jointly "CTERA"), submits:

**Jurisdictional Allegations**

      1.      Plaintiff resides in Kentwood, Kent County, Michigan.

2.     Plaintiff is a former employee of defendant who, at all applicable times of his employment including at the time of his termination, was working from his home in Kentwood, Kent County, Michigan.

3.     Defendant CTERA Networks, Inc. is a foreign profit corporation incorporated under the laws of the State of Delaware, with corporate headquarters located in New York City, New York, yet doing business through plaintiff in the State of Michigan.

4.     CTERA Networks, Inc. maintains no corporate affiliation with the State of Michigan, it is not incorporated, has no affiliate, subsidiary, member, or corporate officer connections with Michigan.

5.     CTERA Networks, Ltd., is an Israeli corporation, with corporate headquarters in the United States located in New York City, New York, and doing business through plaintiff in the State of Michigan.

6.     CTERA Networks, Ltd. maintains no corporate affiliation with the State of Michigan, it is not incorporated, has no affiliate, subsidiary, member, or corporate officer connections with Michigan.

7.     The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.     This Court has original diversity jurisdiction pursuant to 28 USC 1332, because this action is between citizens of difference states and the amount in controversy exceeds the sum or value of $75,000.

9.      Venue is proper in the District under 28 USC 1391(a)(2) and (b)(2) because a substantial part, if not all of the events giving rise to plaintiff's claim occurred in the judicial District.

## General Allegations

### *Plaintiff was a loyal and diligent employee.*

10.     Plaintiff entered an employment relationship with CTERA in 2018.

11.     Plaintiff was a competent, hard-working employee, who was qualified to perform his duties for CTERA.

12.     Throughout his employment, customers of CTERA, co-workers and colleagues, and CTERA's management reported plaintiff as a good employee and a positive performer.

### *Onset of disability … and so too disability discrimination.*

13.     Plaintiff was a Solutions Engineer for CTERA.

14.     Plaintiff was paid using a joint salary and commission compensation plan.

15.     Plaintiff's compensation was based on quotas, measured through an annual company Goal Sheet.

16.     In December 2019, plaintiff's supervisor forecasted to plaintiff what 2020 would look like for plaintiff from a quota perspective. During that conversation, plaintiff's supervisor complimented plaintiff on the hard work plaintiff demonstrated in 2019.

17.     The supervisor assured plaintiff the quota for 2020 would not double, it would likely increase by 20%-30%.

18.     In January 2020, plaintiff disclosed to his supervisor, his supervisor's boss, and to Human Resources that he was experiencing personal mental health issues from past life events for which he was seeking medical treatment, and asked his supervisor and his supervisor's boss for "compassion and understanding" while he was treating.

19.     On January 29, 2020, plaintiff received his 2020 Goal Sheet which revealed his quota had doubled, while his commensurate ability to be compensated did not increase; this was precisely what plaintiff's supervisor said would not happen.

20.     Plaintiff and his supervisor met to discuss the 2020 Goal Sheet, the supervisor's prior assurances, and plaintiff's stated concerns over the increased workload without a comparable increased avenue for compensation. Plaintiff requested a review of his 2020 Goal Sheet for possible modification consistent with the supervisor's assurances given to him.

21.     Thereafter, on February 18, 2020 Human Resources requested an update on plaintiff's health issues.

22.     Plaintiff reported his health was progressing well, and that his previous request for "compassion and understanding" was behind them.

23.    During the conversation, plaintiff stated to the HR Director the same concerns he expressed to his supervisor about the 2020 Goal Sheet, including that he had requested a review of his 2020 Goal Sheet.

24.    Plaintiff was aware that another CTERA employee had requested a review and revision of that employee's 2020 Goal Sheet; the request was granted, and a revised Goal Sheet was promptly given.

25.    The HR Director said she would inquire into plaintiff's request, then responded later instructing plaintiff to speak again with his supervisor.

26.    Thereafter on February 20, 2020, plaintiff was in New York City for a customer meeting; also attending was his supervisor's boss.

27.    After the meeting, the boss requested a private meeting with plaintiff, expressing he heard plaintiff was concerned over the 2020 Goal Sheet.

28.    Plaintiff expressed he was unhappy with the 2020 Goal Sheet, and reiterated what his supervisor had assured him in December 2019, that the quotas would go up 20% to 30% but not double; plaintiff reported the 2020 Goal Sheet doubled quotas without commensurate ways for increased compensation.

29.    In response, the boss became very angry, accusing plaintiff of calling his supervisor "a liar," to which plaintiff calmly restated the assurances he was given were not lies, but he understand his supervisor was giving him assurances from CTERA.

30.    Plaintiff again requested a review of his 2020 Goal Sheet, which the boss responded would be considered.

31.    On February 28, 2020, plaintiff's supervisor emailed plaintiff linking the requested review of the 2020 Goal Sheet with plaintiff's previous request for "compassion and understanding" while he treated for his mental health concern.

32.    Plaintiff responded stating, "from your email it appears these two topics are being combined together. I would like to make it clear from my perspective that these are two very distinct items and should be treated as such."

33.    On March 4, plaintiff met on a call with his supervisor and the boss, during which the boss commended plaintiff on his 2019 performance, stated how impressed he was with plaintiff's work, and then launched into a discussion of plaintiff's health issue from January, saying, "in order for us to fully understand what is going on with your health and to be able to support you, HR is going to send you a form to send to your doctor which will give us a better picture." Plaintiff responded, "why is there such a sudden focus on my health, as everything I've shared lately has been positive regarding how well I am doing and that I feel it's mostly behind us?" The boss replied, "this is what we feel is best and will help us understand your situation the best and be able to support you."

34.    The boss then identified a prospective client of plaintiff's that chose not to work with CTERA, to which the boss said to plaintiff, "I don't blame

you, but I blame your medication and your health issues," to which plaintiff clarified the reason the customer left had nothing to do with his health issues, rather it was because plaintiff had been required by his supervisor to be on a call with another client, which forced him to miss a meeting with the prospective client.

35.   The boss responded by reiterating "we need to understand your health issues to make sure it's not impacting the business."

36.   On March 5, 2020, plaintiff received a health form from HR to be completed by his health care provider, with email instructions stating, "we would like to better understand your health situation in order to be able to accommodate you properly," also saying plaintiff asked CTERA to "consider an accommodation."

37.   That same day plaintiff and the boss were on a call during which plaintiff reiterated his health issue was completely separate from the 2020 Goal Sheet issues he expressed, and he was not requesting an accommodation relating to his health issue, rather he simply wanted a review of his 2020 Goal Sheet consistent with what his supervisor had assured him in December 2019.

38.   On March 9, 2020, plaintiff asked the Human Resources Director for clarity on what accommodation he requested so as to know which medical provider he needed to send the form to for completion.

39.    On March 11 Human Resources communicated saying, "we only requested the certification because we thought that, based on the last conversations you had with me and your managers, you were seeking an accommodation from the company due to some personal issues."

*The narrative changes, and changes again.*

40.    On March 26, 2020, plaintiff received an email stating the medical certification was not required.

41.    Thereafter plaintiff was told he would not get a revised 2020 Goal Sheet unless he provided the requested medical certification.

42.    On April 1 plaintiff received a call from the HR Director who asked him for a "close the loop" note from his doctor and told plaintiff he would get a new 2020 Goal Sheet after HR received the "close the loop" doctor's note.

43.    Plaintiff provided a note from his treater that there were no restrictions to his employment.

44.    On April 8, two months after requesting it, plaintiff finally received a revised 2020 Goal Sheet.

*Plaintiff expresses additional concerns of the revised Goal Sheet.*

45.    On April 9, plaintiff had a call with his supervisor over the revised 2020 Goal Sheet, he expressed the lack of any objective measurables in the revised Goal Sheet, and other concerns, and that he wanted to discuss matters

with Human Resources, to which the supervisor ordered plaintiff to not tell Human Resources anything the supervisor told him.

46.     The supervisor then warned plaintiff that his request for understanding in January, his request for a revised 2020 Goal Sheet, the issue with the medical certification, and his repeating things the supervisor had told him all caused plaintiff to be viewed negatively by upper management.

47.     On April 13, 2020, plaintiff contacted the HR Director to discuss the concerns of subjectivity in the revised 2020 Goal Sheet, to bring to Human Resources' attention the orders given by the supervisor, and to formally complain to CTERA's Human Resources that plaintiff felt he was being discriminated against by his supervisor for a perceived disability.

48.     In response, the HR Director was dismissive of plaintiff's discrimination complaint, going so far as to tell plaintiff she did not want to hear the word "discrimination."

49.     Plaintiff did not hear back regarding his request for an investigation into disability discrimination, until early June when the boss contacted plaintiff to "see how things stood."

*A PIP is implemented.*

50.     Within a day of the boss's call, on June 9, 2020 defendants informed plaintiff he was being placed on a performance improvement plan.

51.    Plaintiff's conduct and performance leading up to June 15, 2020 and thereafter did not warrant being placed on a formal Performance Improvement Plan (PIP).

52.    Rather, it was plaintiff's opposition to the discrimination he was facing because of his disability and/or because defendants deemed plaintiff disabled, that was the reason for being placed on the PIP.

### Plaintiff opposes the PIP as discriminatory and retaliatory.

53.    On June 15, 2020 plaintiff received the formal PIP.

54.    On June 16, plaintiff received a task list to perform the PIP that did not comport to performing his regular duties for CTERA; rather, tasks such as revising or rewriting CTERA's "Frequently Asked Questions" were tasks outside of his prescribed duties for CTERA.

55.    Promptly thereafter plaintiff opposed the PIP in writing as being unattainable, lacking any measurables by which his performance could be evaluated, and being discriminatory and retaliatory based on his disability and/or defendants perceiving plaintiff as disabled.

56.    Plaintiff reported to CTERA's Human Resources that his performance did not warrant a PIP, he provided specific objective examples of positive performance including reports from management and others that his performance exceeded the companies' and clients' expectations, requested an update on his prior discrimination complaint, reiterated that he was being

subjected to disability discrimination, and asked HR to continue to investigate the discrimination he was faced with because of his disability or because he was perceived as disabled.

57.     CTERA's HR director rejected plaintiff's performance examples given, refused to investigate his discrimination claim, responded that HR did not find disability discrimination in the PIP, and ordered him to perform the PIP.

### *Plaintiff performs the PIP.*

58.     From June 16 to July 15, 2020, plaintiff regularly reported his performance under the PIP and the task list assigned.

59.     From June 16 to July 15, 2020, plaintiff performed the PIP despite not being regularly evaluated by his supervisor.

60.     The few occasions when there was communication from his supervisor, plaintiff was told he was satisfactorily performing the PIP tasks assigned to him.

61.     Plaintiff was never told he was not performing the PIP.

### *The PIP is cancelled without a final evaluation.*

62.     The PIP was set to expire on July 15, 2020.

63.     On July 15, 2020, plaintiff's final PIP review was cancelled without a new review being scheduled.

64.     On July 16, 2020, plaintiff met by video chat with his supervisor, thinking he would be told he successfully completed the PIP.

65.    On that call were plaintiff's supervisor and the Human Resources Director to whom plaintiff reported the discrimination and retaliation, including reporting his opposition to the PIP and request to continue the investigation into disability discrimination and retaliation.

### *Plaintiff's employment is terminated.*

66.    During the July 16 call between plaintiff, his supervisor, and the Human Resources Director, there was no discussion of the PIP.

67.    Rather, plaintiff's employment was terminated.

68.    The termination reason given was a purported reduction in force.

69.    Plaintiff inquired further into the reasons for termination and was not given additional information.

70.    Plaintiff was presented with a separation proposal, which contained compensation terms that had previously been guaranteed to him as part of his employment agreement.

71.    At the end of the call, plaintiff was no longer employed by CTERA.

### *Evidence to support the purported reduction in force was pretextual.*

72.    Within two days of being terminated, customers of CTERA contacted plaintiff expressing concern and frustration with CTERA's decision to terminate plaintiff's employment.

73.    The reports were there was work pending that plaintiff had been performing for CTERA's customers.

12

74.     Within days of being terminated, employees of CTERA contact plaintiff expressing concern and frustration with CTERA's decision to terminate plaintiff's employment.

75.     A co-worker's comments were contrary to at least one of the reasons given by CTERA for plaintiff to be placed on the PIP a month earlier.

76.     Within days of being terminated, plaintiff discovered CTERA's online job posting for his position.

77.     Plaintiff performed his duties at least satisfactorily, if not by exceeding expectations, including successfully completing a PIP that was otherwise incapable of being performed.

78.     There exists direct evidence of discrimination and retaliation by CTERA against plaintiff for his reporting the discrimination he was facing.

79.     Alternatively, the PIP was pretextual, as is the purported reason for plaintiff's termination.

80.     There was no legitimate reason for plaintiff to be terminated.

81.     There was no legitimate reason to place plaintiff on a 30-day PIP, only to have the final review of that PIP be cancelled and plaintiff be terminated on the day after the PIP was to be finally evaluated.

82.     Plaintiff had a successful career with CTERA and intended to continue working and seek advancement with the companies.

83.     With the termination, plaintiff lost his wages and benefits, as well as a loss of earning potential and advancement.

84.     Plaintiff was qualified for his positions held within CTERA, and his firing was discriminatory and in retaliation for him reporting disability discrimination based on his disability and/or defendants' perception that plaintiff was disabled.

## COUNT I
## VIOLATIONS OF THE
## MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

85.     Plaintiff incorporates the preceding paragraphs by reference.

86.     For the affected period, plaintiff suffered from a disability as defined in the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1101, *et seq.*

87.     Defendants knew or had reason to know of plaintiff's disability.

88.     Defendants perceived plaintiff as disabled.

89.     Plaintiff was qualified for his position.

90.     Defendants discriminated against plaintiff with respect to his terms, conditions, and privileges of employment because of plaintiff's disabilities.

91.     Defendants discriminated against plaintiff with respect to his terms, conditions, and privileges of employment because defendants perceived him to be disabled.

92.     Defendants treated similarly situated employees who did not have disabilities more favorably than plaintiff.

93.     Defendants treated similarly situated employees who were not perceived to be disabled more favorably than plaintiff.

94.     Defendants implemented adverse employment decisions actions toward plaintiff because of his disability or defendants' perception of plaintiff's disability.

95.     Plaintiff opposed defendants' discrimination against him.

96.     Defendants terminated plaintiff's employment on the basis of his disability or defendants' perception of plaintiff's disability.

97.     Defendants' alleged reason for firing plaintiff was a pretext for disability discrimination.

98.     Defendants terminated plaintiff's employment in retaliation for plaintiff opposing defendants' discrimination against him.

99.     Defendants' discrimination and retaliation denied plaintiff the opportunity for continued employment and adversely affected his compensation, terms, conditions, and privileges of employment in violation of the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1101, *et seq*.

100.   As a direct and proximate result of defendants' discriminatory and retaliatory conduct, plaintiff has suffered injuries and is entitled to: compensation for his loss of wages; compensation for loss of fringe and other benefits; compensation based on his earning potential; non-economic damages arising from the mental anguish, embarrassment, humiliation, anger, and

15

frustration flowing from defendants' perception of plaintiff's disability and being terminated; non-economic damages arising from the exacerbation of the effects of plaintiff's disability; and other incidental, consequential, and if available exemplary damages, including statutory interest, costs, and attorney fees, and attorney fees as an element of damages.

WHEREFORE, plaintiff respectfully requests that this Honorable Court enter judgment against defendants, jointly, severally, and jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with incidental, consequential, compensatory, and/or exemplary damages, interest and attorney fees as elements of damages, statutory interest and statutory attorney fees, and costs.

### JURY DEMAND

Plaintiff Nicholas L. Prill, by his attorneys Sterling Attorneys at Law, P.C., demands a trial by jury.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:    /s/ James C. Baker
      Raymond J. Sterling (P34456)
      James C. Baker (P62668)
      Attorneys for Plaintiff
      33 Bloomfield Hills Pkwy., Ste. 250
      Bloomfield Hills, MI 48304
      (248) 644-1500

Dated: July 30, 2020